J. ANDRÉ BOLES, ESQ.
Nevada Bar No. 003368
423 Mill Street
Reno, Nevada 89502
Tel: (775) 329-1544

Attorney for Plaintiff

# UNITED STATES DISTRICT COURT

# DISTRICT OF NEVADA

**DIANA HEILMAN,**

    **Plaintiff,**

    **v.**

**J. MICHAEL MEMEO,** Individually and in His official capacity as Chief Administrator of the Fourth Judicial District Court of the State of Nevada in and for the County of Elko; **JAMES WATSON**, Individually and in his official Capacity as a Chief Juvenile Probation Officer; The **STATE OF NEVADA**, Ex. Rel. the **FOURTH JUDICIAL DISTRICT COURT OF THE STATE OF NEVADA IN AND FOR THE COUNTY OF ELKO**;

    Defendants.

Case No. **CV-N-04-0683-ECR-VPC**

**PLAINTIFF'S OPPOSITION TO MOTION FOR SUMMARY JUDGMENT by DEFENDANT J. MICHAEL MEMEO**

    COMES NOW the Plaintiff herein, by and through counsel, and files her opposition to the motion made by and on behalf of Defendant J. Michael Memeo for summary judgment in his favor in this matter. This opposition is based on the attached Memorandum of Points and Authorities, the exhibits attached to the Defendant's Motion for Summary Judgment, exhibits thereto, and all pleadings, papers, and documents on file herein.

    Dated this 6th day of November, 2007.

                                                                 /s/
                                                James André Boles, Esq.
                                                Attorney for Plaintiff

# MEMORANDUM OF POINTS AND AUTHORITIES

## Introduction

The only remaining plaintiff in this matter, Diana Heilman, filed this wrongful termination action alleging that she was wrongfully discriminated against in her clerical government employment by being forced to surrender that employment because of her age and gender, taking into account her "heavy" physical appearance. At the time she was forced from her employment, she had been working for more than eight years as a secretary and traffic citation coordinator in the Juvenile Probation Department of the Fourth District Court of the State of Nevada in and for the County of Elko. The one remaining defendant in this matter, J. Michael Memeo, had become one of the two judges in that court shortly before plaintiff lost her employment, and in that capacity he was the official in charge of the probation office. Facts adduced in discovery show that Judge Memeo had a preference for younger and more attractive women in that court-supervised agency. After being forced from her employment, the plaintiff filed this civil rights action pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, *et seq*. She also alleged that she was deprived of due process in being forced summarily to resign without reason, and she added state claims for breach of contract, as well as praying for certain injunctive relief and for attorney's fees.

## FACTS

It is suggested that judicial notice may be taken of the fact that Elko County, with the City of Elko as its county seat, lies in thinly populated eastern Nevada, an area of limited employment opportunities. The plaintiff herein, Diana Heilman (hereinafter "Mrs. Heilman"), an Illinois native, moved to Elko in January of 1995 (Transcript of Deposition of Diana Heilman, Exhibit 2, Defendant's Motion for Summary Judgment, 9:22-25) She was born on August 22, 1949, and was 45 years old at the time. (*Id.* 9:20-21) Her prior work experience included extended employment as a high school librarian and assistant high school principal's secretary in Belleville, Illinois, and as an administrative secretary in Salt Lake City. (*Id.* 12:20-25, 13:6-13, 14:22-8, 15:18-25, 16:17-19) After a divorce and subsequent marriage to an Elko man, she moved to Elko where she already had lined up a position with the Juvenile Probation Department in Elko. (*Id.* 16:25-17:2, 18:14-18, 19:14-16, 19:25-20:4)

1   Mrs. Heilman was hired as the financial secretary and traffic citation coordinator for the Elko
2   probation position by Judge Thomas L. Stringfield, who oversaw the Juvenile Probation Department
3   and with whom she encountered no problems during the time that her tenure overlapped with his.
4   (*Id.* 20:5-9, 20:21-23, 23:22-24, 24:21-25) In elaboration, from the inception of her Elko
5   employment to the end of her employment eight and one-half years later, she experienced no
6   problems with her job, no reprimands and no criticism. (*Id.* 28:10-23) Her job evaluations were
7   "standard or above." (*Id.* 29:4-6)
8   As Juvenile Probation's financial secretary, Mrs. Heilman testified in deposition:

> I collected all Court-ordered fines that were ordered by the Court, I collected restitution that was Court-ordered by the Court, I paid out restitution to victims of the crime. I did all traffic citations and collected all bail money and assessments, and I sent those monies to the proper entities . . . and I would deposit all monies through the County Treasurer. (*Id.* 95:6-13)

12  As traffic citation coordinator, she processed those traffic citations issued to juveniles
13  whenever there was a fine or money assessment, all by sorting the citations, typing letters to the
14  offenders, calculating their bail and instructing them on payment requirements. (*Id.* 104:4-17)
15  Judge Memeo, as new presiding judge of the District Court, took over the Probation
16  Department in August of 2002–when Mrs. Heilman was 53 years old. (*Id.* 32:8-18) During that
17  same month, Judge Memeo and his colleague, Judge Puccinelli, held called a meeting with
18  employees, and Judge Puccinelli "told all of us that were present that none of us would lose our jobs
19  . . . unless there was just cause." (*Id.* 34:13-24)
20  As Defendant Memeo points out in the instant motion, Mrs. Heilman had signed and initialed
21  a two-page document upon being hired that purported to make her an "at will" employee.
22  (Defendant's Exhibit 1, informally, "the hearing agreement.") It contained the language: "[M]y
23  employment with the Juvenile Probation Office may be terminated at the discretion of the Juvenile
24  Judge." (*Id.* p.2, 1st partial paragraph) However, the document also contained this contradictory
25  and–to most minds, it is respectfully submitted–utterly confusing language: "As an employee of the
26  Fourth Judicial District Court I acknowledge that my employment may be terminated pursuant to
27  NRS 62.110, which states: (¶) Probation officers and employees may be removed, discharged or
28  reduced in position only after having been given the reasons therefore in writing and being afforded

an opportunity to be heard before the judge in answer thereto. (¶) I understand that said statute contains no requirement for 'cause', or for an 'appeal', as do similar statutes which apply to larger counties . . . ." (*Id.* p.1, numbered ¶2) In non-statutory language, the document also said that as to appeal the aggrieved party had the right to be given a reason and to have that party's "views heard." (*Id.*)

For the first seven years of Mrs. Heilman's employment, her duties remained relatively constant. (Mrs. Heilman Deposition Transcript, Deft.'s Ex. 2, 38:14-19) She was "very content" with her job. (*Id.* 41:14-16) However, during the late winter and spring of 2002, she was given additional duties. (*Id.* 37:15-23) Asked if she and another employee complained of being "inundated" with additional work, she replied, "Yes." (*Id.* 48:1-6) She also felt that because of office changes, "all employees were alienated from each other." (*Id.* 49:17-19)

James Watson, the chief juvenile probation officer and the intermediate supervisor between her and Judge Memeo from and after the time Judge Memeo took over, assigned her certain budget duties which "I never had anything to do with" and which she regarded as "an administrative thing that had to be done by an administrator, not by me." (*Id.* 52:5-7, 52:1-5) She tried to refer him to the County administrative office that handled such matters. (*Id.* 52:8-13) Still she said, "I don't recall Mr. Watson ever saying anything to me that I wasn't doing my job duties properly." (*Id.* 58:7-13) Moreover, Judge Memeo never voiced concerns to her about her performance. (*Id.* 73:7-10) Prior to June 11, 2003, she had never been called into Watson's office for any discussion of her work performance. (*Id.* 74:9-14) But on that day, at about 11:30 a.m., she was called into Watson's office, with Watson and Juvenile Judge Wong being present. (*Id.* 75:25-76:9) She went on:

> "Judge Wong came in, sat down, and Jim (Watson) was standing behind his desk. Jim looked me directly in the eyes and said, 'I do not want to have to fire you, but I request you submit your resignation because *you do not fit into the mold*.'" (Emphasis added) (*Id.* 75:13-17) She testified further: "And I just hesitated, and I looked over at him and I said, 'No, Jim, I'm going to have to think about it.' And I sat there for a minute, and I looked at the clock and it was like 20 till 12:00. And I said, 'You know, Jim, I will, and I'll be out of here by noon.' (¶) So I went back to my desk and I wrote my resignation letter, put it in his box, packed my personal things and I went out the door." (*Id.* 76:13-25)

Regarding her mental state at the time, she said, "I was just flabbergasted . . . stunned." (*Id.* (*Id.* 66:11-12)

4

James A. Reho, Esq. #2244

1    Watson gave Mrs. Heilman no reason for being forced to resign or be fired and instead just
2    told her he needed to see her in his office. (*Id.* 77:1-4, 9-10) At the time, Mrs. Heilman said, "I
3    didn't know that the mold was." (*Id.* 66:6) However, after reflection and upon hearing about new
4    replacements in the office for persons who left, she came to understand that: "They got rid of me
5    because I was the old one, the heavy one, and they were bringing these more attractive women in,
6    which in my eyes I felt were fitting the mold." (*Id.* 90:19-24) About six months passed before, "In
7    my eyes I put the pieces, what the mold was to me." (*Id.* 91:22-92:1)

8    In support of her factual conclusion, Mrs. Heilman said: "I was the oldest employee, male or
9    female, within the Probation Department at the time. And everybody hired after me, after the
10   original staff eventually left, the majority of the staff originally left and the new staff came on, they
11   were all younger and more attractive, as far as females." (*Id.* 84:4-9) "Well, I didn't know the
12   people's ages, but I knew they were younger and more attractive." (*Id.* 85:3-4) And this: "No. And
13   the attractiveness. No, because I know for a fact they had–I'm a large-sized woman, they were–they
14   were in my eyes what I felt fit the mold. I wasn't fitting the mold, and they were being hired because
15   they were younger and more attractive. They were what I was seeing as fitting the mold." (*Id.* 87:1-
16   6) With regard to specific women, Mrs. Heilman recalled this: "I just know that they were
17   younger," and with regard to one, "she's blonde, and she's cute and she's got a nice figure." (*Id.*
18   114:2-8) Of note, when Mrs. Heilman was forced from her job at age 53 and her replacement, Sue
19   Breitrick, was in her mid-40s. (*Id.* 48:21-23, 54:11-15)

20   On the subject of cause, Mrs. Heilman said of the hearing agreement she signed, Defendant's
21   Exhibit 1, "I signed a contract that said I was an at-will employee . . . with termination for just cause,
22   if there should be a need." (*Id.* 59:7-12) She was asked further, "[D]id they have to have cause if
23   they were to terminate your employment?" She replied: "Yes," adding, "They have to have cause."
24   Additionally, "I feel that I needed to do something bad for them to fire me . . . or request that I
25   resign." (*Id.* 61:15-19, 61:23, 62:21-25)

## POINTS AND AUTHORITIES AND ARGUMENT

### Summary Judgment Standards

28   Summary judgment operates as "an integral part of the federal rules as a whole, which are

designed 'to secure the just, speedy and inexpensive determination of every action.'" *Celotex Corp. V. Catrett*, 477 U.S. 317, 327 (1986). It serves to avoid unnecessary trials when there is no dispute as to the facts before a court. *Northwest Motorcycle Ass'n v. U.S. Dep't of Agric.,* 18 F.3d 1468, 1471 (9th Cir. 1994). Such judgment is not appropriate, however, where reasonable minds can differ on the material facts at issue. *Warren v. City of Carlsbad,* 58 F.3d 439, 441 (9th Cir. 1995), *cert. denied*, 516 U.S. 1171 (1996). The moving party, then, is entitled to summary judgment only where there are no genuine issues of material fact in dispute, based upon viewing the evidence and the inferences arising therefrom in favor of the nonmovant; and given such a circumstance, the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Bagdadi v. Nazar*, 84 F.3d 1194, 1197. Put another way, only when there is no legally sufficient evidentiary basis for a reasonable jury to find for the nonmoving party, is summary judgment appropriate.

The moving party bears the burden of informing the court of the basis for its motion, together with evidence demonstrating the absence of any genuine issue of material fact. *Celotex*, 477 U.S. at 323. The plaintiffs recognize that when the moving party has met that burden, they as the parties opposing the motion may not rest upon mere allegations or denials of the pleadings, but must set forth specific facts showing that there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Although the parties may submit evidence in an inadmissible form, only evidence which might be admissible at trial may be considered by a trial court in ruling on a motion for summary judgment. Fed.R.Civ.P. 56(c); *Beyene v. Coleman Sec. Serv., Inc.,* 854 F.2d 1179, 1181 (9th Cir. 1988). The evidence submitted by the nonmoving party "must be viewed in the light most favorable" to that party. *Addickes v. S.H. Kress and Co.*, 398 U.S. 144, 157 (1970). In support: "All facts and inferences drawn must be viewed in the light most favorable to the responding party when determining whether a genuine issue of material fact exists for summary judgment purposes. *Poller v. CBS, Inc.,* 368 U.S. 464, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962)" *Canada v. Boyd Group, Inc.*, 809 F.Supp. 771, 775 (1992)

In considering a motion for summary judgment, the court is obligated to (1) determine whether a fact is material; (2) determine whether there is a genuine issue for the trier of fact, as determined by the documents submitted to the court; and (3) consider the evidence in light of the

appropriate standard of proof. *Anderson*, 477 U.S. at 248. As to materiality, only disputes over facts that might affect the outcome of the suit under governing law will properly preclude the granting of summary judgment. Irrelevant or unnecessary factual disputes are not to be considered. *Id*.

**Argument and Analysis**

This is a matter in which there was a discharge, which might have been permissible under Nevada law, except that it was for the wrong demonstrable reason. Therefore, it is respectfully submitted that summary judgment for Judge Memeo should not be granted.

Mischief in this matter begins with the hearing agreement, an imprecise and confusing document that, by inference, one has to sign as a condition of employment in the Fourth District Court's probation office. That agreement contains incompatible terms and should be disregarded. First, by reference to statute (NRS 62.110) it provides certain requirements for termination or demotion. The first is that before such an action can occur, the subject of the action must be "given the reasons therefor in writing." As the facts set out above demonstrate, that was not permitted by the defendant and his lieutenant (Watson). Second, it requires that the subject be "afforded an opportunity to be heard before a judge." That was denied via the resign-or-else ruse.'

The terms of the agreement amount to provision for notice of adverse action and opportunity to challenge it, which is to say, due process. By necessity, that implies the existence of a remedy adequate at law.

By further implication, attaching due process to a clerical probation office post eliminates the essence of "at will" employment, that is, employment which is terminable without cause or redress. As a result, subsequent language about "no requirement for 'cause', or for an 'appeal,'" should be deemed impermissibly contradictory and correspondingly of no force and effect. It could be argued, of course, that the partially quoted statute affords an aggrieved probation office employee only the right to air a grievance before a judge, or "ventilate." However, the maxim is that the law abhors a useless act, and the exercise of only the right to ventilate with no possibility of remedy would certainly be useless. Such an argument should fail despite subsequent non-statutory language in the hearing agreement to the effect that probation office employment could be terminated "at the discretion of the juvenile judge" with only a right to be "have my views heard" and be told "why" an

adverse action would taken. Again, a useless act.

Worse, however, than useless, the language is duplicitous. As Mrs. Heilman's testimony demonstrates with some force, it insinuates to the lay, non-lawyer job applicant the existence of job protection where there is no cause for disciplinary action, i.e., no misfeasance, malfeasance or nonfeasance on job performance. Mrs. Heilman was firm in her statements that she "was an at-will employee . . . with termination for just cause," that "They have to have cause," and "I needed to do something bad for them to fire me." Moreover, the evidence adduced does not suggest cause. In short, being told she was out of a job, whether by requested resignation or firing, came after eight years of unblemished job performance.

In *Sands Regent v. Galgardson*, 105 Nev. 436, 777 P.2d 898 (1989) the appellant casino appealed a jury award of damages to two employees, one 52 years old and the other 58 years old, who were arbitrarily terminated without cause. The two had been told they were "too old" at the time of their terminations. They sued on claims including violation of the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 621, *et. seq.*, breach or contract and bad faith discharge. The Nevada Supreme Court found that the two were at-will employees and correspondingly could not assert claims for breach of contract or bad faith discharge, both of which claims "presuppose that the parties had an employment agreement." (*Id.* at 105 Nev. 439) The two had no contractual right to continued employment, the high court said. (*Id.*) However, the damage awards, although modified, were allowed to stand, based on unlawful practices under the ADEA. (*Id.* at 105 Nev. 440)

(In the case at bar, there is an agreement, and it is comprised of a written and signed document together with the conduct of the parties in exchanging work and services for pay. Whether it remained an at-will agreement is another question. Further, it is blackletter law that an agreement between parties to exchange labor for pay is a contract of employment, despite some contentions that certain work appointments to not constitute contracts of employment. It is respectfully urged herein that Judge Memeo functioned under an obligation of good faith and fair dealing in supervising court and probation workers under him, that by directing Watson to get rid of Mrs. Heilman he violated that obligation as well as the ADEA, and that what he contends was an act for which he had discretion was in fact an act that abused that discretion impermissibly.)

In the words of the *Sands Regent* opinion: "[W]e conclude that age discrimination does not fit into the public policy exception to the 'at-will' employment doctrine . . . Clearly, Nevada has a public policy against age discrimination (but) . . . we do not perceive that our public policy against age discrimination is sufficiently strong and compelling to warrant another exception to the 'at-will' employment doctrine (and therefore) . . . only statutory remedies remain." (*Id.* at 105 Nev. 439-440) From there, the court resorted to NRS 613.420 and NRS 233.170 for the calculation of damages for ADEA violations against the two "too old" employees. (*Id.*)

It is respectfully urged here that Mrs. Heilman, subject to jury acceptance of her old age discrimination claims, is entitled at least to an award under ADEA and that summary judgment against her should not be granted. Further, it is noteworthy from the language above that *we do not perceive that our public policy against age discrimination is sufficiently strong and compelling to warrant another exception* stands as a matter of opinion not necessarily binding on this court even though it is from Nevada's highest state court. It is not constitutional; it is not statutory; it is the court's value. That value need not overcome the supremacy clause in the U.S. Constitution.

In another casino job termination case, *Yeager v. Harras's Club, Inc.*, 111 Nev. 830, 897 P.2d 1095 (1995), the Nevada Supreme Court sustained summary judgment for the casino after finding that that a club executive who lost his job in a reorganization was an at-will worker. "Generally, an at-will employment contract can be terminated whenever and for whatever cause by an employer without liability for wrongful discharge if the employment is not for a definite period and if *there are no contractual or statutory restrictions on the right of discharge.* (Emphasis added) (*Yeager*, 111 Nev. At 834) In the case at bar, there is a statutory restriction in the ADEA and there is ample evidence for a jury to find that Mrs. Heilman was compelled to resign because of her age. Therefore, summary judgment is inappropriate.

Mrs. Heilman contends further that the hearing agreement is not a limiting agreement in the sense urged by the defendant. The statute quoted–and she signed what was placed before her, not the entire legislative chapter on public employment–is not by the portion quoted a legislative exclusion of cause and appeal employment rights. She only acknowledged what was before her, as opposed to all of Nevada's employment law.

1       The at-will contention of Judge Memeo also should fail for one other reason–Mrs. Heilman
2 had no earned interest in Judge Memeo's electioneering successes. Under our political system, it is
3 accepted that, and seems to make good sense that, high campaign officials whose candidates win
4 elections be rewarded with appointed offices, for instance, where a campaign manager becomes a
5 chief of staff. This, however, is not the case for Mrs. Heilman. She played no known part in Judge
6 Memeo's election to the bench, and no evidence has been or likely could be adduced that she would
7 have such a part in later campaigns. It is respectfully urged that there should be a finding herein that
8 tying the fortunes of clerical workers in government to election campaigns contravenes public policy.
9 Such workers should not be part of a spoils system.

10       There is a view that with a judge or other judicial officer, more than just a solid error-free job
11 performance by staff including secretaries is needed. Instead, there needs to be something akin to a
12 meshing of minds on the part of the judge, the judge's secretary and the judge's clerk toward the end
13 that they as a team work in the same direction. Such an argument should not be applied here. The
14 reason is that Mrs. Heilman was not a bench functionary. Her job, as shown by her testimony about
15 her job description, was to chase down fines and assessments and notify juvenile offenders of their
16 obligations. That was purely clerical, not discretionary or advisory, and not keyed to the mind of her
17 judges.

18       It is specious to suggest that Mrs. Heilman resigned voluntarily. Her undisputed deposition
19 testimony indicates she had every reason to believe that she was performing job well and was not
20 vulnerable to discipline of any kind when Watson summoned her into his office and demanded her
21 resignation, under pain of dismissal. In shock, and within minutes, she acceded to the demand. She
22 did not think it over. She did not get counsel. She consulted with no one. She simply folded.
23 "I was just flabbergasted . . . stunned," she recalled later. Under the circumstance, acceptance of her
24 resignation was reprehensible.

25       "A constructive discharge occurs when a person quits his job under circumstances in which a
26 *reasonable person* would feel that the conditions of employment have become intolerable." *Draper*
27 *v. Coeur Rochester*, 147 F.3d 1104, 1110 (9th Cir. 1998), quoted in *Lawson v. State of Washington*,
28 296 F.3d 799, 805 (1998) The circuit opinion, on the same page, had these additional words from

*Draper*: "[A]n employee need not demonstrate that his employer intended to force him to resign, but merely that his conditions of employment were objectively intolerable."

In the case at hand, Mrs. Heilman certainly was pushed to a point where her "conditions of employment were objectively intolerable" when she was directed to resign or be fired. It is farcical to say she resigned voluntarily; she was constructively discharged, or at least, a trier of fact could so decide. That discharge, as far as the adduced evidence goes, was because of her age. She has a valid age discrimination claim and therefore summary judgment should be denied.

Judge Memeo argues in his motion that he had full discretion to get rid of Mrs. Heilman as an "at-will" employee. He apparently uses the word in the sense of "Liberty or power of deciding, or of acting according to one's own judgment, or as one thinks fit; uncontrolled power of disposal." (Meaning No. 4, OED, Compact Ed., Oxford Univ. Press, 1971) However, even "uncontrolled power" in this American culture does not permit dumping the old and ugly to make way for the new and pretty in public employment. Such an act is indicative of caprice, "a sudden unpredictable change . . . a tendency to change one's mind without apparent or adequate motive." (See *Webster's Encyclopedic Unabridged Dictionary*, Random House, 1996). The truth of this assertion is enhanced by the failure of Watson and Judge Memeo to provide a valid reason for axing Mrs. Heilman, either at the time of demanding her resignation on pain of being fired, or subsequently in discovery in this matter.

This prohibition on the unbridled, and especially the abusive, exercise of discretion is recognized in Nevada–as a matter of fundamental fairness. This state's law incorporates this spirit of fairness by implying a covenant of good faith and fair dealing in contracts both generally, and in contracts for employment, specifically, as follows:

"**Obligation of good faith**. Every contract or duty within the Uniform Commercial Code imposes an obligation of good faith in its performance and enforcement." (NRS 104.1304) This statute was revised by the Legislature in 2005, and formerly read: "**Obligation of Good faith**. Every contract or duty within this chapter imposes an obligation of good faith in its performance or enforcement." The change was to add the words "within the Uniform Commercial Code." The earlier version, although part of this State's Uniform Commercial Code, had been extended by the

Nevada Supreme Court as well as federal courts to contracts of employment. Reviewing courts had said the obligation of good faith inheres in *every* contract. *K Mart v. Ponsock*, 103 Nev. 39, 732 P.2d 1364, (1987); *Smith v. Claudianos*, 104 Nev. 67, at 69, 752 P.d. 233 (1988); *Hutton v. General Motors Corp.*, 775 F.Supp. 1373, at 1380, (D. Nev. 1991).

It is respectfully suggested here that no legislator, and presumably no court, would admit or seek a finding to the effect that Nevada has formally abandoned good faith as a fundamental in enforcement of its laws regarding agreements under which state employees work. Correspondingly, it is appropriate that it be found in matter that Mrs. Heilman is correct in asserting that, "They have to have cause," and "I needed to do something bad for them to fire me."

Judge Memeo does not contend via deposition testimony, affidavit or other assertion in the instant motion for summary judgment that he had no part in getting rid of Mrs. Heilman. He was Watson's supervisor, directing him. In Mrs. Heilman's view, "[H]e was the overseer of the whole department, so he was basically my main boss." (Mrs. Heilman Deposition Transcript, Deft.'s Ex. 2, 73:11-13)

**CONCLUSION**

WHEREFORE, it is respectfully contended that summary judgment should not be granted to Judge Memeo, principally on the ground that he caused Mrs. Heilman to lose her job in the Fourth District Court probation office wrongfully. Age discrimination–" They got rid of me because I was the old one, the heavy one"–appears from the evidence to be they key motivating factor. That violates the ADEA and overrides any contention of right to act arbitrarily in an at-will employment setting. Whether applied directly or in conformity with the spirit of the law, bad faith amplifies the maliciousness of age discrimination even if it affords no independent ground for relief. The at-will aspects of Mrs. Heilman's contract of employment are outweighed by the prohibition against age discrimination, and correspondingly there should not be summary judgment but a proper jury instruction on the calculation of damages at trial. Issues can be narrowed at this juncture, but it is urged that Mrs. Heilman is entitled to a jury trial on the facts of age discrimination, the losses it caused to her and the determination of her damages. Her second claim for damages based on age discrimination is strong, based on evidence to this point, and it should go to a jury. She was denied

due process, however small if limited to the hearing document, and the reason is that she was constructively terminated and did not resign of her own volition.

Respectfully submitted this 6th day of November, 2007.

/s/
James André Boles, Esq.
Nevada Bar No. 003368
423 Mill Street
Reno, Nevada 89502
Tel: (775) 329-1544

Attorney for Plaintiff

13

**CERTIFICATE OF SERVICE**

Pursuant to FRCP 5, I hereby certify that I am an employee of the law offices of JAMES ANDRÉ BOLES and that on this date, I served a true and correct copy of the foregoing document by:

_____ Depositing for mailing, in a sealed envelope, U.S. Postage prepaid, at Reno, Nevada.

_____ Reno/Carson Messenger Service.

_____ Personal Delivery.

_____ Facsimile.

__X__ E-Filing

addressed as follows:

William C. Jeanney, Esq.
BRADLEY, DRENDEL & JEANNEY, Ltd.
401 Flint Street
Reno, Nevada 89501
Attorney for Defendant Memeo

Catherine Cortez Masto
Attorney General
Kristen Geddes
Deputy Attorney General
Litigation Division
100 N. Carson Street
Carson City, Nevada 89701-4717
Attorneys for Defendant Watson

DATED this 6th day of November, 2007.

_____/s/ (Ursula)_____
An Employee of James André Boles

14

James André Boles, Esq.